484 So.2d 1340 (1986)
MICRO PLUS, INC., Appellant,
v.
FORTE DATA SYSTEMS, INC., and Jay Anderson, Individually, Appellees.
Jay ANDERSON, Appellant,
v.
FORTE DATA SYSTEMS, INC., and Micro Plus, Inc., a Corporation, Appellees.
Nos. 85-866, 85-943.
District Court of Appeal of Florida, Fourth District.
March 12, 1986.
*1341 Donald W. Giffin, of Giffin & Thellman, Tampa, for Micro Plus, Inc.
Robert L. Beals, of Price, Kaczmarek & Beals, Boca Raton, for Jay Anderson.
James L. Armstrong, III, and Anthony Deglomine, III, of Smathers & Thompson, Miami, for appellee-Forte Data Systems.
PER CURIAM.

A.
Since 1974, Washington and Lee University has published Social Responsibility: Business, Journalism, Law, Medicine. In this year's edition, Associate Professor Kenneth E. Goodpaster of Harvard University's Graduate School of Business Administration, has presented his lecture, An Agenda for Applied Ethics, in which he says:
"Mark what I am going to say, Unless either philosophers become kings or those who are now called kings and rulers come to be sufficiently inspired with a genuine desire for wisdom; unless, that is to say, power and philosophy meet together, there can be no rest from troubles, ... There is no other way of happiness either for the state or for the individual."
 Socrates in Plato's Republic, Book V, Chapter XVIII
I.
Socrates was convinced that the relevance of ethics to the world of individual and institutional decision-making was profound. Philosophers needed to become kings or kings needed to become philosophical. In our contemporary context, perhaps we could restate this conviction in terms of professionals and corporate managers  the new "royalty" in our society of organizations.
It was not enough, in the view of Socrates, that philosophers commune with ideas of the good and the just  not even enough that they try in their private or personal lives to embody such ideas. Nor was it enough that professionals and managers be men and women of "good will," doing their best to keep their hands clean in the exercise of power.
Somehow the personal quest for wisdom had to be integrated with institutional management and institutional management had to be inspired by the manager's quest for wisdom. Only in this way would it be possible to avoid a double standard. Only in this way would it be possible to avoid a radical discontinuity between the microcosmic demands of personal virtue and the macrocosmic demands of institutional policy and governance. It was these "troubles" I suggest, the troubles of double standards and discontinuity  moral incoherence  *1342 from which Socrates encouraged us to seek rest.
It is not terribly comforting to notice that the problems posed by Socrates predated modern science, the industrial revolution, capitalism, and the rise of bureaucratic organizations. For these major historical developments have unquestionably complicated our task. They have given rise to sophisticated technologies, professional specializations, and organizational forms that stagger our understanding if they do not weaken our will.
As if this were not enough, we come to the challenges of applied ethics suffering as much from disciplinary myopia as from ideological fragmentation. Skilled at analysis, we are embarrassed by the demands of synthesis. Rewarded for theory, we are too often dumb before the questions of the practitioner.
Id. at 5-6.
This case involves an appeal from a non-final order granting a temporary injunction.[1] *1343
*1344 The writer believed this concurrence was warranted, notwithstanding the temporary nature of the order, to emphasize this writer's belief that the judicial system, with its adversarial proceedings, is used most appropriately in disputes such as the present scenario in which the parties have been dealing throughout at arm's length. However, in (a) familial matters such as probate and dissolution proceedings wherein the parties may well wish to resolve their personal disputes without traumatizing their families or each other and (b) business partnerships wherein the individuals do not wish to destroy their personal relationships while resolving their business disputes, surely there has to be an alternative to the adversarial process.
In the same series of lectures quoted hereinabove, Judge Randall T. Bell of the South Carolina Court of Appeals, entitled his lecture, The Lawyer as Guardian, and said:
When a person with a grievance believes litigation is available, his perception of the disputing process changes. Lawyers and litigating are receiving unprecedented attention in the popular media. A new "rights consciousness" has developed among segments of our society, displacing the former passive acceptance of all kinds of social and economic evils with an activism that often manifests itself in courtrooms. No great leap of logic is required to conclude that the wide publicity given all types of litigation influences perceptions about the entire disputing process.
Moreover, if the dispute is litigated, the process of litigation itself radically transforms the dispute. Many a layman has brought a dispute to law only to see it bent and twisted and reshaped beyond recognition by a process he does not understand for reasons he cannot comprehend. In the end he is faced with an inescapable sense of loss, for when the lawyers and the courts are finished, it is no longer his dispute, the dispute he brought to them in the beginning. A good deal of the popular mistrust of lawyers can be explained as the natural reaction to this process of transformation which robs the dispute of its meaning in lay terms.
Id. at 30 (footnotes omitted).

B.
The appeal also provides the writer with the opportunity to voice his value judgments with respect to contracts of this nature. The legislature has expressly recognized their validity by adoption of Section 542.33(2)(a).[2] This writer has previously addressed the statute in other cases which do not bear citing for the sake of repetition. However, Judge Hersey's important opinion in Silvers v. Dis-Com Securities, Inc., 403 So.2d 1133 (Fla. 4th DCA 1981), does warrant quoting:
Implicit in our holding is a recognition that irreparable injury may be presumed in cases involving violation of a covenant not to compete or not to divulge trade secrets. It need not be alleged nor proved.
Id. at 1136.
In Megatrends (1984), John Naisbitt complimented this state as being one of the *1345 five states in which most social invention occurs. Id. at xxvii. While recognizing the ideas of Plato may not be socially inventive, recognizing the importance of contracts and the judiciary's readiness to enforce them hopefully will discourage their breach and a resulting adversarial proceeding. Today, Plato might suggest that preying be limited to the waters east of A-1-A, not the commercial world west of it.
NOTES
[1] The order reads:

THIS CAUSE came on for hearing by the Court on the motion for temporary injunction of plaintiff, Forte Data Systems, Inc.'s [sic] ("Forte"). After an evidentiary hearing in which testimony and evidence were presented, the court considered memoranda submitted by the parties, and heard argument of counsel. The court sought to reasonably reconcile conflicting testimony and/or evidence where reconciliation was possible. Where the Court found it impossible to reconcile testimony, it has rejected such testimony which contradicts the following findings of fact:
1. Defendant Jay Anderson ("Anderson") was employed by plaintiff, Forte Data Systems, Inc. ("Forte") as its National Sales Manager and, subsequently, its Regional Sales Manager, from on or about September 12, 1983, to on or about August 2, 1984.
2. Anderson executed an employment agreement entitled Agreement Regarding Proprietary Information and Inventions ("Agreement") with Forte on September 12, 1983.
3. Under the terms of the Agreement, Anderson contracted as follows:
3. I understand that my employment by the Company creates a relationship of confidence and trust between me and the Company with respect to any information of a confidential or secret nature that may be learned or developed by me during the period of my employment by the Company and which (i) relates to the business of the Company or to the business of any customer or supplier of the Company, or (ii) has been created, discovered or developed by, or has otherwise become known to the Company and has commercial value in the business in which the Company is engaged (hereinafter called "Proprietary Information"). By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, product plans, strategies, forecasts and customer lists.
4. All Proprietary Information shall be the sole property of the Company and its assigns. I hereby assign to the Company any rights I may have or acquire in all Proprietary Information. At all times, both during my employment and after its termination, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. In the event of the termination of my employment by me or by the Company for any reason, I will promptly deliver to the Company all materials, documents and data of any nature containing or pertaining to any Proprietary Information and I will not take with me any such materials, documents or data or any reproduction thereof.
... .
11. I agree that I shall not for a period of six (6) months immediately following the termination of my employment with the Company for any reason, whether with or without cause, either directly or indirectly (i) call on, solicit or take away, either for myself or for any other person or entity, any of the customers or clients of the Company on whom I called or with whom I became acquainted during my employment with the Company, or (ii) solicit or take away, or attempt to solicit or take away, either for myself or for any other person or entity, any employees of the Company.
4. The limitations imposed in the employment contract are reasonable in the industry, both as to duration and geographic application. The industry (and Forte and Micro Plus) functions on a national scope. Research and development in the industry are such that patents and trademarks, because they require considerable time to obtain, are not feasible and not readily used to protect proprietary information. Hence, the use of contractual agreements and employment contracts with key personnel is a widespread and reasonable means of protecting propriety information.
5. During his employment with Forte, Anderson became familiar with Forte's proprietary and confidential information. In particular, he knew the names of all the Forte distributors, the identity of the individuals who worked at those distributors, the names of Forte's prospective distributors, the identity of the parties with whom Forte was negotiating, the status of such negotiations, the new products Forte was developing, the status of the testing of these new products, Forte's pricing strategy, the cost to Forte of manufacturing its products, where Forte intended to develop new distributors and how many distributors it planned to develop in a given area, the required characteristics for a Forte distributor, the identities of the parties with whom Forte was negotiating for Original Equipment Manufacturer contracts, Forte's sales strategy and other items ("Proprietary Information"). Anderson agreed not to divulge any of this Proprietary Information without the prior written consent of Forte.
6. On August 2, 1984, Anderson's employment with Forte was terminated by the company. On August 23, 1985, Anderson became employed as National Sales Manager by defendant Micro Plus, Inc. ("Micro Plus"), a competitor of Forte's.
7. While employed by Micro Plus, Anderson has violated the terms of the Agreement in that he has disclosed Proprietary Information to Micro Plus and used Forte's Proprietary Information for his gain and that of Micro Plus. He has called upon, solicited and taken away Forte's customers and clients on behalf of Micro Plus for the benefit of himself and Micro Plus.
8. Forte notified Micro Plus of the existence of the agreement on September 25, 1984. Micro Plus took no action to stop Anderson's activities and knowingly reaped the benefits from these activities.
9. The actions described in paragraph 7, have caused and will continue to cause irreparable harm to Forte in that they compromise Forte's Proprietary Information by allowing its competitors to gain unfair competitive advantage over Forte. Such actions also damage Forte's good will with customers and prospective customers. Forte has no remedy at law for these damages. The damages are impossible to ascertain and recovering them would require a multiplicity of suits.
It is thereupon ORDERED AND ADJUDGED as follows:
1. The equities are with Forte and against Anderson and Micro Plus.
2. A valid enforceable contract of employment was made between Anderson and Forte on September 15, 1985 [sic]. The provisions contained in Paragraph 3, 4 and 11 thereof which prohibit competition and solicitation are reasonable in duration and geographic application.
3. Anderson and his agents, employees, servants and those persons and entities in active concert or participation with him including, but not limited to, independent contractors, are enjoined from directly or indirectly using or disclosing or causing to be used or disclosed any of Forte's Proprietary Information on behalf of or for the benefit of Anderson or any other person or entity including, but not limited to, Micro Plus. The term "using" is defined, for purposes of this order, as taking any action or causing another person or entity to take action based upon or influenced by this knowledge. The term "disclosing", for purposes of this order, is defined as transmitting knowledge in written or spoken form.
4. Anderson and his agents, employees, servants and those persons and entities in active concert or participation with him including, but not limited to, independent contractors, are enjoined from directly or indirectly calling upon, soliciting or taking away any customers or clients of Forte's on whom Anderson called or with whom Anderson became acquainted during his employment with Forte on behalf of or for the benefit of Anderson or any other person or entity including, but not limited to, Micro Plus, for six months from the date Forte posts the bond referred to in paragraph 7, below. The term "customer" is defined, for purposes of this order, as Original Equipment Manufacturers, end-users and distributors of Forte's during the term of Anderson's employment with Forte, September 12, 1983, to August 1, 1984. The prospective application of the six-month injunction is based upon the contractual provisions of the Anderson-Forte employment Agreement and upon the precedent of Capelouto v. Orkin Exterminating Co. of Florida, 183 So.2d 532 (Fla. 1966), appeal dismissed, 385 U.S. 11, 87 S.Ct. 78, [17 L.Ed.2d 10], rehearing denied, 385 U.S. 964, 87 S.Ct. 390 [17 L.Ed.2d 310].
5. Micro Plus and its officers, agents, employees, servants, directors and those persons and entities in active concert or participation with it including, but not limited to, independent contractors, are enjoined from directly or indirectly using or disclosing or causing to be used or disclosed any of Forte's Proprietary Information. The term "using" is defined, for purposes of this order, as taking any action or causing another person or entity to take action based upon or influenced by this knowledge. The term "disclosing", for purposes of this order, is defined as transmitting knowledge in written or spoken form.
6. Micro Plus and its officers, agents, employees, servants, directors and those persons and entities in active concert or participation with them including, but not limited to, independent contractors, are enjoined from directly or indirectly calling upon, soliciting or taking away any customers or clients of Forte's, if the identities or names of such customers or clients were procured from Anderson, for six months from the date Forte posts the bond referred to in paragraph 7, below, based upon the precedent of Capelouto.
7. Forte Data is hereby ordered to post a bond in the amount of $50,000.00, subject to the Court's approval of form and substance.
8. Micro Plus is hereby ordered to provide actual notice of this order to each of its officers, agents, servants, employees, directors and persons in active concert or participation with them including, but not limited to, independent contractors.
[2] Section 542.33(2)(a), Florida Statutes (1985), provides:

One who sells the goodwill of a business, or any shareholder or a corporation selling or otherwise disposing of all of his shares in said corporation, may agree with the buyer, and one who is employed as an agent or employee may agree with his employer, to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, so long as the buyer or any person deriving title to the goodwill from him, and so long as such employer continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction, be enforced by injunction.